## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN MAURICE MCDONALD,** | : | **Civil No. 3:21-cv-0311** |
| | : | |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **WARDEN OF SCI** | : | |
| **FRACKVILLE, et al.,** | : | |
| | : | |
| **Respondents.** | : | |
| | : | |

## MEMORANDUM OPINION[1]

## I.  Introduction

This petition for habeas corpus relief was referred to us on November 2, 2023. The petitioner, John Maurice McDonald, was convicted of first-degree murder for the 2016 shooting death of Todd Dunlap at the Harrisburg, Pennsylvania after-hours club called Forever Nights. At trial, McDonald testified that he did not remember much about the night of the murder because he had been up for two days and had been drinking all night, taking ecstasy, and had smoked a formaldehyde cigarette. (Doc. 7-10, at 36-46). He testified that he was so intoxicated that he did not remember shooting Todd Dunlap or leaving Forever Nights. (Id.) Thus, McDonald

---

[1] We exercise plenary jurisdiction of this petition pursuant to 28 U.S.C. § 636 with the consent of all parties. (Doc. 10).

takes issue with his first-degree murder conviction, claiming that trial counsel failed to adequately investigate and present arguments that would have mitigated his charge from first-degree murder to a lesser charge of third-degree murder or voluntary manslaughter based on evidence of his voluntary intoxication and provocation by the victim, Todd Dunlap. He also challenges trial counsel's decision not to move to suppress several statements he made to police which he alleges were the inadmissible result of a custodial interrogation under Miranda v. Arizona, 384, U.S. 436 (1966).

The Pennsylvania state courts carefully reviewed each of these arguments in McDonald's PCRA petition and found them to be without merit. McDonald then filed the instant petition for writ of habeas corpus requesting that this Court grant him a new trial on his convictions for Murder in the First Degree and associated firearms because his trial counsel was ineffective and violated his right to a fair trial. After review of the record, we find that McDonald's claims in his petition are without merit. Accordingly, for the reasons set forth below, we will deny his petition.

## II.   **Statement of Facts and of the Case**

The factual background of the instant case was aptly summarized by the Pennsylvania Superior Court in its decision affirming the denial of McDonald's petition for post-conviction relief:

> On May 9, 2015, Shanelle Franklin arrived at Forever Nights, an after-hours bar in Harrisburg, at approximately 2:00 a.m. (Transcript of

2

Proceedings, Jury Trial, p.86) (hereinafter "N.T."). After speaking with friends at the front of the bar, Ms. Franklin walked toward the restroom at the back of the bar. There, Ms. Franklin saw her cousin, Asia Bethea talking to Defendant [hereinafter "Appellant"]. N.T. at 87. Ms. Bethea asked Ms. Franklin to compare Appellant to Ms. Bethea's former boyfriend. *Id.* Ms. Franklin's response to the question angered Appellant. Appellant called her "a bitch" and the two argued. N.T. at 224. Ms. Franklin testified that she could understand Appellant and that Appellant did not slur his words. N.T. at 94.

As they argued, Appellant pushed Ms. Franklin in the face with an open hand. N.T. at 88. Ms. Franklin walked away to get security. *Id.* A security guard, along with the victim, Todd Dunlap, walked to the back of the bar to speak with Appellant. *Id.* Todd Dunlap told Appellant, "You've got to go. You can't be putting your hands on women. It's early in the evening and you're already starting." *Id.* Appellant argued and told Mr. Dunlap, "I ain't going no F-ing where." N.T. at 89. Appellant then swung a gun and struck Mr. Dunlap. Appellant did not fall as he swung the gun. N.T. at 95.

As Mr. Dunlap stumbled to the ground, Appellant shot him in the back of the head. N.T. at 90, 150. Ms. Franklin began screaming for someone to call police. Mr. Dunlap appeared to be alive for a few moments but expired before police arrived. N.T. at 91. Appellant stepped over Mr. Dunlap's body and walked out of the bar in a manner which Ms. Franklin described as "just normal." N.T. at 90. He did not run. *Id.* Ms. Franklin identified Appellant as the shooter. N.T. at 97.

Asia[2] Bethea saw Appellant walk out of the bar, get into his car and drive away. N.T. at 224. The disc jockey at Forever Nights, Abraham Reese, observed the events from approximately 4 feet away as he set up his equipment that night. N.T. at 70. He observed Appellant stand on his own without assistance as he argued with Ms. Franklin. N.T. at 79. When Mr. Reese heard the shot, he saw people scatter and run. N.T. at 71. Appellant walked away from Mr. Dunlap's body. N.T. at 73. Mr.

---

[2] At trial, Asia Bethea identified herself as "Kahadeeja Bethea" but the filings in this case and subsequent court rulings refer to her as Asia. Thus, we will identify her as Asia throughout.

Reese also identified Appellant in a police photo lineup as the shooter. N.T. at 78.

Another bar patron, Jasmine Easter, was seated at a table talking to friends when she heard the "pop" of a gunshot and saw a flash. N.T. at 108. Mr. Dunlap's body hit the table at which she was seated, causing it to flip over. N.T. at 108. Ms. Easter told police in a transcribed interview that the individual who fired the gun "walked over [Mr. Dunlap's body] and went outside." N.T. at 110-111. At trial, Ms. Easter identified Appellant as the shooter. N.T. at 112.

Appellant's cousin, Mariah Selvy, was also present at Forever Nights at the time of the shooting. She witnessed Appellant swing the gun at Mr. Dunlap then shoot him. N.T. at 196. Ms. Selvy testified that Appellant was high that night, but that she did not see him using drugs. N.T. at 202.

Pennsylvania State Police first arrived at the scene. Harrisburg Police Officer Nathan Ishman also responded following a call received at 2:24 a.m. N.T. at 120. Officer Ishman observed Mr. Dunlap's body at the back of the bar and a shell casing from a semiautomatic weapon a few feet away. Id. Officer Ishman did not see Appellant in the bar. N.T. at 129.

Harrisburg City Police Detective Christopher Silvio spoke to officers at the scene who provided Appellant's name as the suspect. N.T. at 158. Detective Silvio informed United States Marshalls. N.T. at 160. Police arrested Appellant in Baltimore, Maryland on May 26, 2015.

Forensic pathologist Wayne Ross, M.D., conducted an autopsy. Dr. Ross determined the cause of death to be a gunshot wound to the head and the manner of death to be homicide. N.T. at 147. Dr. Ross determined that the shot was fired from a distance of not less than three to four feet. *Id.*

Appellant testified at trial that on the night of the shooting, he used ectacy [sic], drank alcohol and smoked marijuana soaked in formaldehyde. Appellant recalled that he drank brown liquor and refilled his cup each time it was empty. N.T. at 231. Appellant recalled that prior to arriving at Forever Nights, he bought one bottle of liquor,

"Ciroc," for himself and one for a friend for his birthday. N.T. at 232. Appellant recalled that he drove from a nearby bar, Double D's to Forever Nights. Id. Defendant denied any recollection of shooting Mr. Dunlap. N.T. at 240.

Trial Court Opinion, 12/6/18, at 1-5.

Commonwealth v. McDonald, No. 249 MDA 2019, 2019 WL 5401085, at *1–3 (Pa. Super. Ct. Oct. 22, 2019).

Following a two-day trial, on March 6, 2016, a jury found McDonald guilty of first-degree murder and carrying firearms without a license and the court imposed a life sentence without the possibility of parole for the murder charge and a concurrent sentence of two to four years imprisonment for the firearms charge. (Doc. 2, at 10). McDonald filed a post-sentence motion, arguing the weight of evidence was insufficient to convict him in light of the evidence of his extreme intoxication, that was denied by the trial court without an opinion. (See Doc. 7-3, at 1). He filed his direct appeal to the Superior Court of Pennsylvania on September 28, 2016, arguing that, since the evidence of McDonald's intoxication was virtually uncontested, the Commonwealth had failed to meet its burden to refute McDonald's intoxication defense and that the district court abused its discretion in failing to grant a new trial. (Doc. 7-1).

The Superior Court affirmed McDonald's conviction and dismissed his appeal. Following this ruling McDonald did not seek allocator with the Pennsylvania Supreme Court. McDonald then filed a *pro se* petition pursuant to Pennsylvania's

Post Conviction Relief Act ("PCRA") on May 30, 2017. (Doc. 7-4, at 1-44). He later filed an amended counseled petition on January 22, 2018 after Michael Palermo, Esq. was appointed as his counsel, incorporating his arguments from his previous *pro se* petition. (Doc. 7-4, at 56-62). This petition alleged five claims of ineffective assistance of trial and appellate counsel, including trial counsel's alleged failure to put forth a diminished capacity defense and retain/call supporting experts to set forth such a defense at trial, alleged failure to file a pre-trial motion to suppress statements made by McDonald while in custody but without the benefit of <u>Miranda</u>, alleged failure to impeach the Commonwealth's witnesses when their contradicting and voluntary statements were available at trial, alleged failure to seek a voluntary manslaughter instruction after positive evidence of provocation at trial, and alleged failure to insure that McDonald received proper time credit towards his sentence while in pre-trial custody.[3] (Doc. 7-4, at 58-59).

The trial court denied McDonald's PCRA petition on December 6, 2018, without a hearing, (Doc. 7-4, at 65, 81-92), and a final order dismissing the PCRA petition was entered on January 16, 2019. (<u>Id.</u>, at 96). McDonald appealed the PCRA denial to the Superior Court, and on October 22, 2019, the Superior Court affirmed the trial court's decision to deny the petition without a hearing, (Doc. 7-7; <u>Commonwealth v. McDonald</u>, No. 249 MDA 2019, 2019 WL 5401085, at *1 (Pa.

---

[3] This final argument is not addressed in the instant petition.

6

Super. Ct. Oct. 22, 2019)), and denied a petition for rehearing on December 19, 2019. (Doc. 2, at 13). The Pennsylvania Supreme Court then denied McDonald's Petition for Allowance of Appeal on May 13, 2020. (Id.)

Thereafter, McDonald filed the instant habeas corpus petition under 28 U.S.C. § 2254 on February 19, 2021. (Doc. 1). In his petition, McDonald raises four grounds that he believes entitle him to relief based upon a violation of his right to effective assistance of counsel. He alleges that his trial counsel was ineffective because he failed to file a motion to suppress statements he made in violation of Miranda, failed to investigate and use available evidence to impeach Commonwealth witnesses at trial and elicit evidence supporting defenses to first-degree murder, failed to investigate and use available evidence to present a valid diminished capacity defense, and failed to use available evidence to present a heat of passion defense and request a voluntary manslaughter instruction. The respondents filed a response to the petition on March 16, 2021, (Doc. 7), and the petitioner filed a supplemental reply on April 13, 2021. (Doc. 13). Thus, the petition is ripe for resolution.

After review of the petition and the underlying state court record, we find that McDonald's claims are without merit. Thus, given the deferential standard of review that applies to habeas petitions like McDonald's, we will deny McDonald's petition.

7

III.   **Discussion**

A. **State Prisoner Habeas Relief–The Legal Standard.**

(1) **Substantive Standards**

In order to obtain federal habeas corpus relief, a state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus must satisfy the standards prescribed by 28 U.S.C. § 2254, which provides in part as follows:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
>
> (b) (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts of the State;
> ..........
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254(a) and (b).

As this statutory text implies, state prisoners must meet exacting substantive and procedural benchmarks in order to obtain habeas corpus relief. At the outset, a petition must satisfy exacting substantive standards to warrant relief. Federal courts may "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in

custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts. Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings led to a "fundamental defect which inherently results in a complete miscarriage of justice" or was completely inconsistent with rudimentary demands of fair procedure. See e.g., Reed v. Farley, 512 U.S. 339, 354 (1994). Thus, claimed violations of state law, standing alone, will not entitle a petitioner to § 2254 relief, absent a showing that those violations are so great as to be of a constitutional dimension. See Priester v. Vaughan, 382 F.3d 394, 401–02 (3d Cir. 2004).

## (2) Deference Owed to State Courts

These same principles which inform the standard of review in habeas petitions and limit habeas relief to errors of a constitutional dimension also call upon federal courts to give an appropriate degree of deference to the factual findings and legal rulings made by the state courts in the course of state criminal proceedings. There are two critical components to this deference mandated by 28 U.S.C. § 2254.

First, with respect to legal rulings by state courts, under § 2254(d), habeas relief is not available to a petitioner for any claim that has been adjudicated on its merits in the state courts unless it can be shown that the decision was either: (1)

"contrary to" or involved an unreasonable application of clearly established case law; see 28 U.S.C. § 2254(d)(l); or (2) was "based upon an unreasonable determination of the facts," see 28 U.S.C. § 2254(d)(2). Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts. See Rice v. Collins, 546 U.S. 333, 338–39 (2006); see also Warren v. Kyler, 422 F.3d 132, 139–40 (3d Cir. 2006); Gattis v. Snyder, 278 F.3d 222, 228 (3d Cir. 2002).

In addition, § 2254(e) provides that the determination of a factual issue by a state court is presumed to be correct unless the petitioner can show by clear and convincing evidence that this factual finding was erroneous. See 28 U.S.C. § 2254(e)(1). This presumption in favor of the correctness of state court factual findings has been extended to a host of factual findings made in the course of criminal proceedings. See, e.g., Maggio v. Fulford, 462 U.S. 111, 117 (1983) (per curiam); Demosthenes v. Baal, 495 U.S. 731, 734–35 (1990). This principle applies to state court factual findings made both by the trial court and state appellate courts. Rolan v. Vaughn, 445 F.3d 671 (3d Cir.2006). Thus, we may not reassess credibility determinations made by the state courts, and we must give equal deference to both the explicit and implicit factual findings made by the state courts. Weeks v. Snyder,

219 F.3d 245, 258 (3d Cir. 2000). Accordingly, in a case such as this, where a state court judgment rests upon factual findings, it is well-settled that:

> A state court decision based on a factual determination, ..., will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceeding. Miller–El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003). We must presume that the state court's determination of factual issues was correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Campbell v. Vaughn, 209 F.3d 280, 285 (3d Cir.2000).

Rico v. Leftridge–Byrd, 340 F.3d 178, 181 (3d Cir. 2003). Applying this standard of review, federal courts may only grant habeas relief whenever "[o]ur reading of the PCRA court records convinces us that the Superior Court made an unreasonable finding of fact." Rolan, 445 F.3d at 681.

### (3) Ineffective Assistance of Counsel Claims

These general principles apply with particular force to habeas petitions that are grounded in claims of ineffective assistance of counsel. It is undisputed that the Sixth Amendment to the United States Constitution guarantees the right of every criminal defendant to effective assistance of counsel. Under federal law, a collateral attack of a sentence based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in order to survive. Specifically, to prevail on a claim of ineffective assistance of counsel, a petitioner must establish that: (1) the performance of counsel fell below an objective standard of reasonableness; and (2) that, but for counsel's errors, the result of the underlying

11

proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687-88, 691-92 (1984). A petitioner must satisfy both of the Strickland prongs in order to maintain a claim of ineffective counsel. George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001).

At the outset, Strickland requires a petitioner to "establish first that counsel's performance was deficient." Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001). This threshold showing requires a petitioner to demonstrate that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment. Id. Additionally, the petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Id. However, in making this assessment "[t]here is a 'strong presumption' that counsel's performance was reasonable." Id. (quoting Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir. 1996)).

But a mere showing of deficiencies by counsel is not sufficient to secure habeas relief. Under the second Strickland prong, a petitioner also "must demonstrate that he was prejudiced by counsel's errors." Id. This prejudice requirement compels the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id.

Thus, as set forth in Strickland, a petitioner claiming that his criminal defense counsel was constitutionally ineffective must show that his lawyer's "representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689). The petitioner must then prove prejudice arising from counsel's failings. "Furthermore, in considering whether a petitioner suffered prejudice, '[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" Rolan, 445 F.3d at 682 (quoting Strickland, 466 U.S. at 696) (internal quotations omitted).

Although sometimes couched in different language, the standard for evaluating claims of ineffectiveness under Pennsylvania law is substantively consistent with the standard set forth in Strickland. See Commonwealth v. Pierce, 527 A.2d 973, 976–77 (Pa.1987); see also Werts v. Vaugh, 228 F.3d 178, 203 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted Strickland

and thus was not 'contrary to' established Supreme Court precedent"). Accordingly, a federal court reviewing a claim of ineffectiveness of counsel brought in a petition under 28 U.S.C. § 2254 may grant federal habeas relief if the petitioner can show that the state court's adjudication of his claim was an "unreasonable application" of Strickland. Billinger v. Cameron, 2010 WL 2632286, at *4 (W.D. Pa. May 13, 2010). In order to prevail against this standard, a petitioner must show that the state court's decision "cannot reasonably be justified under existing Supreme Court precedent." Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004); see also Waddington v. Sarausad, 555 U.S. 179, 190 (2009) (where the state court's application of federal law is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable") (internal citations and quotations omitted).

When considering a habeas petition filed by a state prisoner pursuant to 28 U.S.C. § 2254, there is additional hurdle is added to the petitioner's substantive burden under Strickland.  As the Supreme Court has observed a "doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009); see also Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas"). This doubly deferential standard of review applies with particular force to strategic

judgment like those thrust upon counsel in the instant case. In this regard, the Court

has held that:

> "The proper measure of attorney performance remains simply
> reasonableness under prevailing professional norms." <u>Id.</u>, at 688, 104
> S. Ct. 2052. "Judicial scrutiny of counsel's performance must be highly
> deferential," and "a court must indulge a strong presumption that
> counsel's conduct falls within the wide range of reasonable professional
> assistance." <u>Id.</u>, at 689, 104 S. Ct. 2052. "[S]trategic choices made after
> thorough investigation of law and facts relevant to plausible options are
> virtually unchallengeable." <u>Id.</u>, at 690, 104 S. Ct. 2052.

<u>Knowles v. Mirzayance</u>, 556 U.S. 111, 124, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d

251 (2009). The deference which is owed to these strategic choices by trial counsel

is great.

> Therefore, in evaluating the first prong of the <u>Strickland</u> test, courts
> "must indulge a strong presumption that counsel's conduct falls within
> the wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action 'might be considered sound trial
> strategy.'" <u>Id</u>. The presumption can be rebutted by showing "that the
> conduct was not, in fact, part of a strategy or by showing that the
> strategy employed was unsound."

<u>Lewis v. Horn</u>, 581 F.3d 92, 113 (3d Cir. 2009) (quoting <u>Thomas v. Varner</u>, 428

F.3d 491, 499-500 (3d Cir. 2005)) (footnote omitted).

### (4) <u>Procedural Benchmarks – Exhaustion and Procedural Default</u>

#### a. <u>Exhaustion of State Remedies</u>

State prisoners seeking relief under section 2254 must also satisfy specific,

additional procedural standards. Among these procedural prerequisites is a

requirement that the petitioner "has exhausted the remedies available in the courts of the State" before seeking relief in federal court.  28 U.S.C. § 2254(b).  In instances where a state prisoner has failed to exhaust the legal remedies available to him in the state courts, federal courts typically will refuse to entertain a petition for habeas corpus.  Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002).

This statutory exhaustion requirement is rooted in principles of comity and reflects the fundamental idea that the state should be given the initial opportunity to pass upon and correct alleged violations of the petitioner's constitutional rights. O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999). The Supreme Court has explained that "a rigorously enforced total exhaustion rule" is necessary in our dual system of government to prevent a federal district court from upsetting a state court decision without first providing the state courts the opportunity to correct a constitutional violation.  Rose v. Lundy, 455 U.S. 509, 518 (1982).  Requiring exhaustion of claims in state court also promotes the important goal of ensuring that a complete factual record is created to aid a federal court in its review of § 2254 petitions.  Walker v. Vaughn, 53 F.3d 609, 614 (3d Cir. 1995).  A petitioner seeking to invoke the writ of habeas corpus, therefore, bears the burden of showing that all of the claims alleged have been "fairly presented" to the state courts, and the claims brought in federal court must be the "substantial equivalent" of those presented to the state courts. Evans v. Court of Common Pleas, 959 F.2d 1227, 1231 (3d Cir. 1992); Santana v.

Fenton, 685 F.2d 71, 73-74 (3d Cir. 1982). A petitioner cannot avoid this responsibility merely by suggesting that he is unlikely to succeed in obtaining state relief, since it is well-settled that a claim of "likely futility on the merits does not excuse failure to exhaust a claim in state court." Parker v. Kelchner, 429 F.3d 58, 63 (3d Cir. 2005).

Although this exhaustion requirement compels petitioners to have previously given the state courts a fair "opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim," Picard v. Connor, 404 U.S. 270, 276 (1971), this requirement is to be applied in a commonsense fashion. Thus, the exhaustion requirement is met when a petitioner submits the gist of his federal complaint to the state courts for consideration, without the necessity that the petitioner engage in some "talismanic" recitation of specific constitutional clams. Evans, 959 F.2d at 1230-33. Similarly, a petitioner meets his obligation by fairly presenting a claim to state courts, even if the state courts decline to address that claim. Dye v. Hofbauer, 546 U.S. 1 (2005) (per curiam); Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004).

### b. **Procedural Default**

A necessary corollary of this exhaustion requirement is the procedural default doctrine, which applies in habeas corpus cases. Certain habeas claims, while not exhausted in state court, may also be incapable of exhaustion in the state legal system

17

by the time a petitioner files a federal habeas petition because state procedural rules bar further review of the claim.  In such instances:

> In order for a claim to be exhausted, it must be "fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 844-45, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999). If a claim has not been fairly presented to the state courts and it is still possible for the claim to be raised in the state courts, the claim is unexhausted . . . .
>
> If a claim has not been fairly presented to the state courts but state law clearly forecloses review, exhaustion is excused, but the doctrine of procedural default may come into play.  A procedural default occurs when a prisoner's federal claim is barred from consideration in the state courts by an "independent and adequate" state procedural rule.  Federal courts may not consider the merits of a procedurally defaulted claim unless the default and actual "prejudice" as a result of the alleged violation of the federal law or unless the applicant demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1991).

Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002).

"[A] federal court will ordinarily not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus '[o]ut of respect for finality, comity, and the orderly administration of justice.'  This is a reflection of the rule that 'federal courts will not disturb state court judgments based on adequate and independent state law procedural ground.'"  Hubbard v. Pinchak, 378 F.3d 333, 338 (3d Cir. 2004) (citations omitted).  Given these concerns of comity, the exceptions

to the procedural default rule, while well-recognized, are narrowly defined.  Thus,

for purposes of excusing a procedural default of a state prisoner seeking federal

habeas relief, "[t]he Supreme Court has delineated what constitutes 'cause' for the

procedural default:  the petitioner must 'show that some objective factor external to

the defense impeded counsel's efforts to comply with the State's procedural rule.'"

Werts v. Vaughn, 228 F.3d 178, 192-93 (3d Cir. 2000) (citations omitted).  Similarly,

when examining the second component of this "cause and prejudice" exception to

the procedural default rule, it is clear that:

> With regard to the prejudice requirement, the habeas petitioner must
> prove "'not merely that the errors at … trial created the possibility of
> prejudice, but that they worked to his actual and substantial
> disadvantage, infecting his entire trial with error of constitutional
> dimensions.'"  This standard essentially requires the petitioner to show
> he was denied "fundamental fairness" at trial.  In the context of an
> ineffective assistance claim, we have stated that prejudice occurs where
> "there is a reasonable probability that, but for counsel's deficient
> performance, the result of the proceeding would have been different."

Id. at 193 (citations omitted).

Likewise, the "miscarriage of justice" exception to this procedural bar rule is

also narrowly tailored, and requires a credible assertion of actual innocence to justify

a petitioner's failure to comply with state procedural rules. Hubbard, 378 F.3d at

338.

Procedural bar claims typically arise in one of two factual contexts. First, in many instances, the procedural bar doctrine is asserted because an express state court ruling in prior litigation denying consideration of a habeas petitioner's state claims on some state procedural ground. In such a situation, courts have held that:

> A habeas claim has been procedurally defaulted when "a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman v. Thompson, 501 U.S. 722, 730, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1991). For a federal habeas claim to be barred by procedural default, however, the state rule must have been announced prior to its application in the petitioner's case and must have been "firmly established and regularly followed." Ford v. Georgia, 498 U.S. 411, 423-24, 111 S. Ct. 850, 112 L.Ed.2d 935 (1991). Whether the rule was firmly established and regularly followed is determined as of the date the default occurred, not the date the state court relied on it, Doctor v. Walters, 96 F.3d 675, 684 (3d Cir. 1996), because a petitioner is entitled to notice of how to present a claim in state court.

Taylor v. Horn, 504 F.3d 416, 427-28 (3d Cir. 2007). (citing Ford, 498 U.S. at 423-24).

In other instances, the procedural default arises, not because of an express state court ruling, but as a consequence of a tactical choice by a habeas petitioner, who elects to waive or forego a claim in the course of his state proceedings, and thus fails to fully exhaust the claim within the time limits prescribed by state statute or procedural rules. In such instances the petitioner's tactical choices in state court litigation also yield procedural defaults and waivers of claims federally. See, e.g.,

20

Johnson v. Pinchak, 392 F.3d 551 (3d Cir. 2004) (procedural default where petitioner failed to timely pursue state claim); Hull v. Freeman, 991 F.2d 86 (3d Cir. 1993) (same). Accordingly, a petitioner's strategic choices in state court waiving or abandoning state claims may act as a procedural bar to federal consideration of his claims, unless the petitioner can show either "cause and prejudice" or demonstrate a "fundamental miscarriage of justice."

It is against these legal benchmarks that we assess McDonald's petition.

**B.  This Petition Will Be Denied.**

McDonald alleges that his trial counsel was ineffective because he failed to file a motion to suppress statements he made in violation of Miranda, failed to investigate and use available evidence to impeach Commonwealth witnesses at trial and elicit evidence supporting defenses to first degree murder, failed to investigate and use available evidence to present a valid diminished capacity defense, and failed to use available evidence to present a heat of passion defense and request a voluntary manslaughter instruction. However, as we will discuss below, these claims were thoroughly considered by the state courts and denied on their merits. Accordingly, this petition will be denied.

**(1) Failure to Suppress Non-Mirandized Statements**

McDonald first argues that his right to the effective assistance of counsel was violated when his trial counsel failed to file a motion to suppress statements made

by McDonald in violation of <u>Miranda</u>. McDonald references statements he made to detectives in transit to the Harrisburg police station after being apprehended in Baltimore. He argues that the detectives interrogated him without first reading him his <u>Miranda</u> rights and that his trial counsel's failure to move to suppress those statements prejudiced him because the Commonwealth used his statements as evidence of his culpability at trial.

The trial court and the Superior Court addressed this argument in considering McDonald's PCRA petition. The trial court found that there was no basis for trial counsel to have sought suppression of McDonald's statements as, since the police officers testified that they were not questioning McDonald, no <u>Miranda</u> violation occurred. Moreover, the court found that the statements McDonald made were not incriminating. The trial court considered the testimony of Detective Paul:

> Harrisburg City Police Department Detective Jason Paul testified that while transporting Defendant from Baltimore, absent questioning from the detectives, Defendant stated that he was not at the bar and would "beat the case". (N.T. pp. 176-178). Detective Paul testified as follows:

>> Attorney Sprow (for the Commonwealth): So you go down there to Baltimore, you pick him up. Tell us about the trip back.

>> Detective Paul: We went down. We picked him up, like Detective Silvio had said. We just told him we were there to bring him back to Harrisburg. When we began driving, we were just talking to him about how poor the conditions were down in Baltimore, at which point he asked if we were sheriffs. I said, no, we were detectives, and "I'm the

detective that filed the charges against you." At that point he began to talk to us about the case.

Attorney Sprow: And let me ask you this. Did you initiate any conversation with him about the case, or did he initiate that?

Detective Paul: He initiated. Like I said, we were basically talking about Baltimore. We weren't planning to even bring up the case on the drive back. He was the one that brought it up to us.

Attorney Sprow: So what did he say?

Detective Paul: Once I said I was the detective that filed the case, he said he wasn't worried, he was going to beat the case anyhow because he wasn't there, and he knows the bar doesn't have camera systems; but even if it did have camera systems, it wouldn't show him because he wasn't there anyhow.

(N.T. p. 176).

***

Detective Paul: Then he goes on to say that -starts asking me about witnesses. I told him we weren't going to get into that, I didn't want to discuss what we had and didn't have in the case. He told me it didn't matter if we had witnesses, it was Mother's Day weekend, and everybody would have been drunk and high anyhow. When I told him "Well, that may be the case that people were drinking and using drugs, but there's no drug that would link everybody to see the same thing and tell the same version of what occurred." He just put his head down and said, "Word."

(N.T. pp. 176-178).

On cross-examination by Trial Counsel, Detective Paul testified that he did not read Defendant <u>Miranda</u> because detectives did not question him. (N.T. p. 179).

23

> Because Defendant voluntarily offered statements to the detectives, in the absence of questioning, no <u>Miranda</u> violation occurred. Statements made not as a result of custodial interrogation, but rather, as "blurt outs" are admissible despite the fact that Miranda warnings were not given. <u>Commonwealth v. Odrick</u>, 410 Pa. Super. 245, 248, 599 A.2d 974, 976 (1991) citing <u>Commonwealth v. Duval</u>, 453 Pa. 205, 307 A.2d 229 (1973). Further, Defendant's statement was not inculpatory. Accordingly, Attorney McQuillan properly refrained from filing a motion to suppress.

(Doc. 7-4, at 87-88).

The Superior Court agreed with the decision of the trial court, but focused on the prejudice caused by the admission of McDonald's statements:

> "[W]here a defendant alleges that counsel ineffectively failed to pursue a suppression motion, the inquiry is whether the failure to file the motion is itself objectively unreasonable, which requires a showing that the motion would be meritorious." <u>Commonwealth v. Johnson</u>, 179 A.3d 1153, 1160 (Pa. Super. 2018). "[T]he defendant must establish that there was no reasonable basis for not pursuing the suppression claim and that if the evidence had been suppressed, there is a reasonable probability the verdict would have been more favorable." <u>Commonwealth v. Watley</u>, 153 A.3d 1034, 1044 (Pa.Super. 2016) (citation omitted).

> After careful review of the notes of testimony of Appellant's criminal trial, we concur with the trial court that Appellant has not demonstrated a reasonable probability that his verdict would have been more favorable had suppression of his statements occurred. Appellant's alleged statements while riding with the detectives were, on balance, not incriminating, as they consisted largely of his denials of having been at the club on the night of the fatal shooting.

> To the extent Appellant contends his response, "Word," to the detective's suggestion that "there was no drug that would [cause] everybody ... to tell the same version of what occurred[,]" was damning, we find his answer was, at best, of uncertain meaning. Moreover, such

24

an answer was inconsequential given the unanimity of eyewitness testimony, in which numerous eyewitnesses identified Appellant as the man who shot the victim, Todd Dunlap, Jr., at the Forever Nights nightclub in Harrisburg. We, therefore, reject this ineffectiveness claim.

Commonwealth v. McDonald, No. 249 MDA 2019, 2019 WL 5401085, at *5 (Pa.

Super. Ct. Oct. 22, 2019).

In our view, neither the trial court nor the Superior Court's analysis of this issue is contrary to or an unreasonable application of clearly established case law nor based upon an unreasonable determination of facts. McDonald argues in the instant petition that it was undisputed that detectives did not give Miranda warnings and, because his Fifth Amendment rights were violated in obtaining the statements, there was no reasonable basis for failing to file a motion to suppress. As to the first Strickland prong, whether McDonald's trial counsel's performance fell below an objective standard of reasonableness, it appears his decision not to move to suppress these statements was a strategic choice rather than an error. On this score, we are reminded of the deference owed to the strategic choices by trial counsel and must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Lewis, 581 F.3d at 113, and that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Burt, 571 U.S. at 22 (quoting Strickland, 466 U.S. at 690).

Although we do not have the benefit of any testimony or affidavit by McDonald's trial attorney as direct evidence of his strategy, in his *pro se* PCRA petition, McDonald explained the decision not to file a motion to suppress these statements:

> 9. During the pretrial process, after receiving a copy of the case discovery, Petitioner recognized that the detectives alleged that Petitioner made statements to them during the transport to the police station. Petitioner informed counsel that the detectives never read him his Miranda rights prior to the conversation.
> 10. Petitioner informed counsel that most of the statements in the police reports were false and should be suppressed because of he wasn't Mirandized. Counsel then informed Petitioner that if he wanted to challenge the admissibility of those statements, counsel would file the motion for $2500.
> 11. Counsel replied that filing a motion to suppress the statements wasn't necessary because they weren't incriminating

(Doc. 7-4, at 4). Thus, it appears trial counsel was aware McDonald made these statements without being Mirandized but made the strategic choice not to move to suppress them because they were not incriminating.

Trial counsel's strategy with regard to these statements becomes clear upon review of the trial transcript. Trial counsel was clearly aware that the Commonwealth would have Detectives Silvio and Paul would testify as to these statements and, on cross-examination, made it clear that they did not read McDonald his <u>Miranda</u> rights. On cross-examination of Detective Silvio, trial counsel asked:

> Q. At no point did you ever Mirandize him or tell him what his rights were; correct?

A. No. We didn't ask him any questions about the case.

Q. Well, you just said that you asked him about the SIM card.

A. At the Booking Center, yes.

Q. Oh. So you don't identify yourself, you don't Mirandize him, and you're driving for about an hour and a half back to Harrisburg; correct?

A. Correct.

Q. And you talk to him about the case certainly; right?

A. He was asking us questions about the case, yes.

Q. And you were responding?

A. He just asked, like I said, about he wasn't there. He was just making statements to us. And then he asked about witnesses, and that's when Detective Paul advised him he wasn't going to get into that with him.

Q. After Detective Paul finally identifies himself as the detective that has charged him with murder -- right?

A. Yes.

Q. -- you continue to speak about the case?

A. He did, yes.

Q. And at no point, again, was he Mirandized?

A. That's correct.

Q. At some point you get back to Harrisburg, and you take him to the Booking Center?

A. Yes.

Q. That's when you ask him about the SIM card?

A. At the Booking Center, yes.

Q. Was that -- did you at any time read him his Miranda rights?

A. No.

(Doc. 7-9, at 113-114). Trial counsel also took steps to summarize these statements, demonstrating that he did not believe they would be prejudicial in the eyes of the jury:

Q. And what Mr. McDonald tells you is that he wasn't there, he didn't do it, that there's no cameras there, and that everyone in that bar is drunk and high?

27

> A. Yes. He didn't say he didn't do it. He just said he wasn't even there and there wasn't any security cameras.

(Id., at 115).

Detective Paul testified similarly as to the statements McDonald made on their trip from Baltimore to Harrisburg. And, again, trial counsel asked, as he had asked Detective Silvio, if he read the defendant his Miranda rights, to which he answered no, "we weren't asking any questions." (Doc. 7-9, at 127). But trial counsel reminded Paul that they asked McDonald about his SIM card at the Booking Center, which Paul acknowledged. (Doc. 7-9, at 127). Thus, it appears these statements were thoroughly considered by trial counsel when crafting trial strategy and that trial counsel viewed them as nonprejudicial and favored addressing them head on with the detectives. Further, trial counsel's judgment that McDonald would not have prevailed on a motion to suppress the statements was objectively reasonable given the evidence which supported by the PCRA court's view that the statements were voluntary and not the result of a custodial interrogation. Therefore, trial counsel's decision not to move to suppress McDonald's statements to the detectives did not fall below an objective standard of reasonableness.

Nor would the suppression of these statements have likely changed the outcome of the underlying proceeding. McDonald argues that the Commonwealth's reliance on his statements that he was going to "beat the case" because he wasn't there, that the witnesses were too drunk to recall because it was Mother's Day, that

he took the SIM card out of his phone and that he knew they were coming for him undermined his diminished capacity defense because of the inferences of "consciousness of guilt" from the alleged statements. Indeed, McDonald testified that he did not remember the argument at Forever Nights, shooting Dunlap, or leaving the club that night. (Doc. 7-10, at 42-44). But, more incriminating than any of the cryptic or nonspecific statements McDonald made to the police is the evidence that McDonald fled Harrisburg to Baltimore following the shooting and, despite knowing he was wanted by the police, failed to turn himself in for over three weeks, until he was located by the United States Marshal Service tracking his cell phone. (Doc. 7-10, at 44; Doc. 7-9, at 106-110).

In closing statements, the Commonwealth did acknowledge that the statements McDonald made to police should be considered as consciousness of guilt, for example that he stated he was not there but also stated that there were no security cameras and witnesses would be too drunk or high, but also reminded the jury that McDonald fled to Baltimore and evaded capture for three weeks despite knowing that he was wanted and testified that he did not flee when he was captured only because he saw officers with rifles. (Doc. 7-10, at 60-61). In our view, even without the admission of the statements McDonald made to police, the jury could have viewed this as evidence of consciousness of guilt. Further, three witnesses, including McDonald's cousin, Mariah Selvey, Asia Bethea, who was with McDonald at

Forever Nights, and Shanelle Franklin all testified that McDonald shot Dunlap. (Doc. 7-9, at 38; Doc. 7-10, at 4, 33-34). Thus, we do not view it as error that the PCRA court found that the suppression of these statements would have changed the outcome of the trial. Accordingly, McDonald as failed to demonstrate any direct prejudice which flowed from this strategic choice by counsel.

### (2) Failure to Impeach Commonwealth Witnesses and Elicit Evidence Supporting Defenses to First Degree Murder

Next we turn to the petitioner's argument that his right to effective assistance of counsel was violated when counsel failed to investigate and use available evidence to impeach Commonwealth witnesses at trial and elicit evidence supporting defenses to first-degree murder. The petitioner's argument focuses on trial counsel's cross-examination of witnesses, specifically Shanelle Franklin, who the petitioner argues made prior inconsistent statements to police about the petitioner's intoxicated state and conduct before and after the shooting on which trial counsel failed to impeach her. Specifically, the petitioner argues that Ms. Franklin's testimony was inconsistent with her statement made to police that the victim did not fall after the petitioner hit him with his gun, that the victim and the petitioner were face to face, and that the victim lunged to grab the petitioner's shoulders then was shot. He also highlights inconsistencies between Ms. Franklin's statements regarding the petitioner's intoxicated state – noting that she told police she believed the shooter was on some type of narcotics, but later testified that he was not slurring his words.

According to the petitioner, the failure of trial counsel to impeach Ms. Franklin on these prior inconsistent statements shows he failed to investigate the facts available within case discovery to support his defense of diminished capacity.

In assessing this argument, the Pennsylvania Superior Court found that trial counsel's failure to impeach Shanelle Franklin on cross-examination with her prior inconsistent statement to the police indicating that the victim did not fall before the petitioner shot him was not prejudicial because the court had already rejected his theory of provocation in the case and the petitioner failed to provide support for a diminished capacity defense. The court also disagreed that trial counsel's failure to underscore the inconsistency in Ms. Franklin's testimonies was prejudicial "given the unanimity of eyewitness testimony against him." Commonwealth v. McDonald, No. 249 MDA 2019, 2019 WL 5401085, at *5 (Pa. Super. Ct. Oct. 22, 2019).

In our view, the state court's rejection of this argument was not in error. Much of the petitioner's argument focuses on trial counsel's cross-examination of Ms. Franklin. On this score, "[a]n attorney's decision regarding cross-examination of witnesses is strategic in nature and will not constitute the basis for ineffective assistance of counsel if such decisions are reasonably made." Revel v. Pierce, 66 F.Supp.3d 517, 527 (D. Del. 2014) (citing Diggs v. Owens, 833 F.2d 439, 444-45 (3d Cir. 1987)). As the Supreme Court has explained:

31

> The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

United States v. Cronic, 466 U.S. 648, 656–57, 104 S. Ct. 2039, 2045–46, 80 L. Ed. 2d 657 (1984). Thus, for example, a complete denial of effective cross-examination would be constitutional error in "entirely fail[ing] to subject the prosecution's case to meaningful adversarial testing." Id. at 659. However, "if counsel only fails to challenge the prosecution's case at specific points, to further a reasonable trial strategy, and not in its entirety, then Cronic does not apply." Davenport v. Diguglielmo, 215 F. App'x 175, 182 (3d Cir. 2007) (citing Bell v. Cone, 535 U.S. 685, 695-96 (2002)).

Here, it is clear that trial counsel's cross-examination of the witnesses was strategic and not the result of ineffective assistance. Trial counsel zealously cross-examined witnesses but adopted a different strategy than perhaps the petitioner would have used given the benefit of hindsight following the conviction. In our view, focusing his cross-examination on undermining the memory of the witnesses by asking them if they were intoxicated, knowing that Forever Nights was a place where

people went after they had been drinking, and also asking about the lighting, trying to indicate that it would be difficult to see, was reasonable.

For example, trial counsel undermined testimony of Shanelle Franklin saying it was "bright as day" with cross-examination of Jasmine Easter saying she did not agree with that. (Doc. 7-9, at 65). He asked each eyewitness about the drug use that goes on at Forever Nights, again trying to undermine the credibility of the witness testimony, and focused on the fact that McDonald testified that he did not remember committing the murder and that the murder weapon was found in the possession of another person who was not included in the police lineups from which the witnesses identified McDonald. (Doc. 7-9, at 128-130). All of this demonstrates trial counsel's reasonably made, strategic decisions regarding cross-examination of witnesses that cannot constitute the basis for ineffective assistance of counsel.

Further, we agree with the state court that the petitioner was not prejudiced by trial counsel's alleged failure to properly impeach Shanelle Franklin for previous inconsistent statements. The petitioner focuses on inconsistent evidence that could have undermined Ms. Franklin's testimony with regard to whether McDonald acted in the "heat of passion" or with the requisite malice for first-degree murder. The petitioner argues that Franklin's trial testimony gave the indication that McDonald pistol whipped Dunlap to the ground then calmly walked over him, when in reality the shooting was the result of an argument between McDonald and Dunlap in which

Dunlap got in McDonald's face and lunged to grab his shoulders. The petitioner highlights the police report in which Franklin reported that McDonald hit Dunlap with his gun, but that Dunlap did not fall, and that Dunlap grabbed McDonald's shoulders and they were face to face when McDonald shot Dunlap. The petitioner contrasts Ms. Franklin's statements in the police report with her testimony that Dunlap stumbled to the ground after being hit at which point McDonald shot him. This, according to petitioner, undermined his heat of passion defense.

Accepting that Ms. Franklin's statements to police regarding the specifics of the incident and her testimony at trial differed in these respects, in our view, this discrepancy did not undermine the petitioner's heat of passion defense. In fact, Franklin described an argument between McDonald and Dunlap in her direct examination:

> A. He got to arguing with the guy BJ and Todd. Todd was, like, "You need to calm down." Like, "Who puts their hands on women? She's little," and it's, like -- excuse my language. He's like, "She's little as shit." Like, "You just in here putting your hands on females." Like, "You got to go." "I ain't going no F-ing where. I ain't going no F-ing where." So he got in Todd's face. Todd went to go restrain him. He was trying to get him out, and he hit him with the gun.
>
> Q. Now, just to back you up a little bit, who hit who with the gun?
>
> A. He hit Todd with the gun

(Doc. 7-9, at 38). Further, other evidence presented at trial supported a view that McDonald was involved in an argument with Dunlap prior to the shooting. For

34

example, Jasmine Easter described hearing an argument break out prior to the shooting, (Doc. 7-9, at 54-55), and trial counsel had Asia Bethea testify on redirect that Dunlap was not a security guard or bouncer. (Doc. 7-10, at 35-36). Moreover, Franklin's testimony that McDonald stood over Dunlap and shot him was contradicted by forensic evidence demonstrating that Dunlap was shot from three to four feet away or more. (Doc. 7-9, at 100-101). Thus, due to the conflicting testimony, the weight of which tended to show that there was some sort of argument between Dunlap and McDonald prior to the shooting and that he was not shot while lying on the floor, we cannot say that, had trial counsel impeached Franklin about her prior inconsistent statements about these facts, it would have made a difference in the outcome of the trial.

As to whether the petitioner was prejudiced by trial counsel failing to impeach Franklin for responding "no" when asked if McDonald was slurring his words or fell over after hitting the victim, despite her prior statements that "she believed the shooter was on some type of narcotics" this statement is simply not inconsistent with Franklin's testimony. In fact, there was no shortage of testimony that McDonald had used drugs and alcohol that night, but very little evidence, beyond McDonald's own statements, that he was so intoxicated that he could not hold a conversation or stand up. In fact, Mariah Selvey testified that McDonald was "real, real high" but never stated that he could not stand or speak, (Doc. 7-10, at 8-9), and Asia Bethea, who

accompanied McDonald to Forever Nights, testified that he was drunk but holding a conversation, (Doc. 7-10, at 23-24), and that he got in his car and drove away after the shooting. (Id., at 33). Importantly, McDonald managed to flee the bar following the shooting and evade capture for three weeks seemingly undermining his theory that he was too intoxicated to stand or speak.

Finally, to the extent that the petitioner attempts to argue that trial counsel was ineffective because he did not review the record, including police reports, prior to trial, there is ample evidence in the trial transcript that he did cross-examine witnesses about their statements to police, including highlighting that Mariah Selvey told police he was "real, real high" (Doc. 7-10, at 8), and refreshing Asia Bethea's recollection by producing a copy of her interview with police to clarify her statements regarding the gun she believed McDonald used. (Doc. 7-10, at 27-31).

Accordingly, since trial counsel had a reasonable strategy for his cross-examination of witnesses, including Ms. Franklin, her allegedly inconsistent statements were not so significant as to change the outcome of the trial, and the issue of McDonald's intoxication was thoroughly developed by counsel at trial this argument is without merit.

### (3) Failure to Investigate and Use Available Evidence to Present a Valid Diminished Capacity Defense

The petitioner's next argument in support of his theory of ineffective assistance of counsel is that trial counsel failed to call experts or provide evidence

necessary to present a valid diminished capacity defense based on his misunderstanding of the law governing a voluntary intoxication defense.

In his PCRA petition, McDonald made the argument that trial counsel was ineffective for failing to call experts or provide evidence of his diminished capacity at trial. But his renewed argument now alleges that this failure to present evidence was based on trial counsel's misunderstanding of the law which governs a voluntary intoxication defense. On this score, McDonald's Superior Court appeal argued that, once a defendant raises the defense of voluntary intoxication, it is the Commonwealth's burden to disprove the elements of such defense beyond a reasonable doubt, and reiterated, "[a]s required by law, the court instructed the jury that it was the Commonwealth's burden to disprove voluntary intoxication beyond a reasonable doubt." (Doc. 7-1, at 18). His direct appeal was denied by the Superior Court which found, balancing the testimony of Defendant's drug and alcohol consumption with witness' testimony as to his actions, the weight of evidence supported the finding that Defendant possessed the requisite specific intent to kill.

The Superior Court affirmed the trial court's judgment of sentence, holding that the finding of the trial court that the weight of the evidence did not "shock one's sense of justice" was not an abuse of discretion. In its decision affirming McDonald's sentence, the Superior Court discussed the standard governing a diminished capacity defense, stating:

This Court has previously made clear that a defense of diminished capacity grounded in voluntary intoxication is a very limited defense, which does not exculpate the defendant from criminal liability, but, if successfully advanced, mitigates first degree murder to third degree murder. Commonwealth v. Hutchinson, 25 A.3d 277, 312 (Pa. 2011). The mere fact of intoxication is not a defense; rather, the defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised by voluntary intoxication that he was unable to formulate the specific intent to kill. Id. In other words, to prove a voluntary intoxication defense, the defendant must show that he was "overwhelmed to the point of losing his faculties and sensibilities." Id. (quoting Commonwealth v. Blakeney, 946 A.2d 645, 653 (Pa. 2008); see also Commonwealth v. Collins, 810 A.2d 698, 701 (Pa. Super. 2002) (concluding, generally, defendant has the burden of proving the defense by a preponderance of the evidence when a defense is asserted that relates to the defendant's mental state or to information that is peculiarly within the defendant's own knowledge and control.). In response, the Commonwealth need not "disprove a negative." Commonwealth v. Rose, 321 A.2d 880, 884 (Pa. 1974). Although the Commonwealth retains the burden of persuasion, "[o]nce a defendant has come forward with [evidence of his intoxication], ... the Commonwealth ... may introduce testimony to refute it, but is under no duty to do so." Id. 3

Commonwealth v. McDonald, No. 680 MDA 2016, 2017 WL 946675, at *3 (Pa. Super. Ct. Mar. 10, 2017).

Thus, with regard to McDonald's trial, the court went on to state:

Herein, balanced against testimony describing Appellant's use of alcohol and ecstasy, the Commonwealth proffered evidence that Appellant (1) was responsive to Mr. Dunlap, (2) did not slur his words during his argument with Ms. Franklin, (3) managed to walk over Mr. Dunlap's body to exit the establishment, and (4) drove himself away following the murder. The jury was free to believe all, part, or none of this evidence. Small, 741 A.2d at 672. The court instructed the jury to consider Appellant's defense. *See* N.T. at 269–71. Clearly, however, the jury determined that the Commonwealth's evidence established the requisite, specific intent to kill. Rose, 321 A.2d at 884.

Id.

The Superior Court's decision also observed in a footnote that:

Appellant has erroneously suggested that it is "the Commonwealth's burden to disprove the elements" of his voluntary intoxication defense. *See* Appellant's Brief at 15–16 (citing in support <u>Rose</u>, 321 A.2d at 884). To the contrary, the <u>Rose</u> Court noted specifically that "the Commonwealth has an *unshifting* burden to prove beyond a reasonable doubt all elements of the crime." Rose, 321 A.2d at 884 (emphasis added). This burden is unaltered by Appellant's intoxication defense. <u>Id.</u>

<u>Commonwealth v. McDonald</u>, No. 680 MDA 2016, 2017 WL 946675, at *3 (Pa. Super. Ct. Mar. 10, 2017). Thus, this footnote, read in isolation, can be construed to suggest that McDonald's defense was confused regarding the burden of proof for a defense of voluntary intoxication in homicide cases.

However, upon closer scrutiny of the trial record it is clear that there was no such confusion by trial counsel. The PCRA petition was denied without a hearing and the court found that trial counsel had vigorously pursued the defense of voluntary intoxication, despite trial counsel using only witness testimony and no expert. The PCRA court also denied the petition on this ground because McDonald did not present any additional evidence that he suffered from a diminished capacity at the time beyond what was presented at trial. The Superior Court dismissed the appeal of the PCRA petition stating that McDonald failed to plead or make an offer of proof that he had an expert witness who would testify that he suffered from a diminished capacity at the time of the murder.

39

McDonald now argues that the reason there was no expert evidence available was because trial counsel failed to investigate and present adequate evidence not as a strategy but because of trial counsel's misunderstanding of the law regarding the voluntary intoxication defense. He relies on this passing statement by the Superior Court to support this claim, but the trial record shows that all parties were clear as to the allocation of the burden of proof on this specific defense. In fact, the trial judge *did* instruct the jury that it was the Commonwealth's burden to disprove voluntary intoxication. Regarding this defense, the jury was instructed as follows:

> Now, the defense has raised as a defense voluntary intoxication as a defense to first degree murder. I'll begin with some general rules about intoxication or drug conditions. Generally speaking, a person who voluntarily used intoxicants or drugs is not allowed to claim as a defense he was so intoxicated or drugged that he was legally incapable of committing a crime, nor is the person allowed to rely on evidence of his own intoxication or drug condition to prove that he lacked an intent, knowledge, or other mental state required for a particular crime. However, these general rules do not apply to a charge of first degree murder.

> The defendant is permitted to claim as a defense that he was so overpowered by intoxicants or drugs that the defendant had lost control of his faculties and was incapable of forming the specific intent to kill required of first degree murder.

> The Commonwealth has the burden of proving this defense. Excuse me. *The Commonwealth has the burden of disproving this defense.* Thus, you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant, despite any intoxication or drug condition, was at the time capable of forming a specific intent to kill and did, in fact, form that intent.

> Voluntary intoxication or drug condition may reduce a murder from first degree to third degree, but no lower. The general rules apply to lesser crimes. They prevent a defendant from using his or her own voluntary intoxication or drug condition in any way to defend himself against an accusation of third degree murder or any other crime that is charged in this case.

(Doc. 7-10, at 78-80) (emphasis added).

Thus, it appears trial counsel used the proper standard in his argument to the Superior Court but in any event the Superior Court's interpretation does not spoil the findings of the jury. At trial, defendant's counsel, the judge, and the jury were all operating with the same understanding of law, that the Commonwealth had the burden of disproving a voluntary intoxication defense as part of its obligation to prove all of the elements of this offense. In fact, even if it was the jury instruction that was an incorrect statement of the law, this interpretation would have only favored the petitioner since the jury was instructed of this higher burden on the Commonwealth in disproving the diminished capacity defense.

In our view, given that the jury *was* instructed that the Commonwealth had the burden of disproving a voluntary intoxication defense, and the jury found it had met that burden, there was no prejudice to the petitioner that his counsel had this understanding of the law. Moreover, although the petitioner presents Pennsylvania caselaw arguing that counsel had an affirmative duty to investigate and present adequate, probative, and relevant evidence of a diminished capacity to reduce McDonald's culpability from first-degree to third-degree murder, it is clear that

41

counsel developed such evidence at trial, and secured a favorable jury instruction on this issue, but to no avail since in the jury's eyes the evidence established that McDonald murdered his victim. On these facts, the state court has already found this argument to be meritless. And, given the deferential standard of review that governs habeas petitions, and our independent review of the record which supports the state court's finding that trial counsel zealously pursued a diminished capacity defense, but other evidence suggested that McDonald had the capacity to form the requisite intent, we cannot say the state court's dismissal of his PCRA petition was a misunderstanding of fact or misstatement of law. As here, McDonald again presents only bald statements regarding the necessity of an expert in establishing his diminished capacity but has provided no offer of proof as to the existence of such an expert, the petitioner's argument on this score fails.

(4) **Failure to Use Available Evidence to Present a Heat of Passion Defense and Request a Voluntary Manslaughter Instruction**

Related to this argument, the petitioner essentially avers that trial counsel failed to compile and present the evidence of a "heated confrontation" to the jury in a way that supported a provocation-based defense to first-degree murder. According to the petitioner, this is because trial counsel failed to adequately review discovery in preparation for trial and thus was blind to contradictory statements and evidence of provocation and failed to impeach witnesses. He also alleges that this error was

compounded by trial counsel's failure to request a voluntary manslaughter instruction.

The Superior Court addressed the law which governs a provocation-based defense in considering McDonald's PCRA petition:

> To receive a "heat of passion" voluntary manslaughter instruction, the petitioner must demonstrate that there was evidence in the record that supports such an instruction. Commonwealth v. Sanchez, 82 A.3d 943, 979 (Pa. 2013). Specifically, evidence that demonstrates that at the time of the killing, the petitioner acted under a sudden and intense passion resulting from serious provocation from the victim. Id. at 979.
>
> The ultimate test to determine whether provocation by the victim was sufficient remains, "whether a reasonable man who was confronted with the provoking events would become impassioned to the extent that his mind was incapable of cool reflection." Commonwealth v. Hutchinson, 25 A.3d 277, 314–15 (Pa. 2011) (quoting Commonwealth v. Thornton, 431 A.2d 248, 252 (Pa. 1981)). Neither words of provocation nor slight assault is sufficient to reduce murder to manslaughter. See Commonwealth v. Sheppard, 648 A.2d 563, 566 (Pa.Super. 1994) (serious provocation not established when victim struck defendant's brother and arguments ensued between defendant and victim); Commonwealth v. Cartagena, 416 A.2d 560, 563 (Pa.Super. 1979) (stating that a punch by the victim was not legally adequate provocation for the defendant to stab the victim).

Commonwealth v. McDonald, No. 249 MDA 2019, 2019 WL 5401085, at *4 (Pa. Super. Ct. Oct. 22, 2019). The court found that McDonald had not met his obligation to demonstrate a provocation-based defense meriting a voluntary manslaughter instruction, stating:

> Appellant directs our attention to witness statements that contain substantively consistent descriptions of the nightclub fight in question. All statements confirm that Appellant pushed a woman away from him,

she sought assistance from club security, and the victim—who was not working security that night—and several others confronted Appellant about assaulting a woman. There is some conflict among the statements as to who initiated the physical altercation, but all agree that Appellant retrieved a handgun from his waistband and shot the victim in the head at the victim's first attempted punch.

Even if we read the proffered statements in a light most favorable to Appellant to permit the assumption, arguendo, that the victim attempted to swing first, we still find the statements would have been insufficient to warrant a "heat of passion" instruction under the above-referenced decisional law. Therefore, we discern no arguable merit to Appellant's claim that counsel was ineffective for failing to investigate adequately a "heat of passion" defense and seek a voluntary manslaughter instruction.

Id.

We agree with the Superior Court's factual findings which are well supported by the trial evidence. Given that federal courts may only grant habeas relief whenever "[o]ur reading of the PCRA court records convinces us that the Superior Court made an unreasonable finding of fact," Rolan, 445 F.3d at 681, these well-founded factual determinations by the state courts defeat this habeas claim.

Further, as to whether McDonald was prejudiced by trial counsel's failure to highlight evidence that McDonald acted out of provocation, for example statements that Dunlap "lunged" at him, as the Superior Court pointed out, much of this evidence of an altercation was presented at trial. For example, Ms. Franklin's testimony that McDonald, "got to arguing with the guy BJ and Todd . . he got in Todd's face . . . Todd went to restrain him . . . he was trying to get him out and he

hit him with the gun," (Doc. 7-9, at 37), and Ms. Easter's testimony that "[a]fter I sit down . . . an argument broke out. After the argument broke out, I just seen the flash, and the guy's body hit my table," (Doc. 7-9, at 54-55). And any inclusion of testimony that Dunlap "lunged" at McDonald or that they were "face to face," would have been balanced against the greater weight of the evidence tending to show McDonald had time for cool reflection, for example testimony of the forensic investigator that Dunlap had no weapons on him, (Doc. 7-9, at 81), forensic evidence that Dunlap was shot in the back of the head from a distance of three to four feet, (Id., at 100-101), and testimony that McDonald walked out of the bar and drove away following the shooting. (Doc. 7-10, at 33).

Additionally, we are operating under a strong presumption that "under the circumstances, the challenged action "might be considered sound trial strategy." Lewis 581 F.3d at 113 (internal quotations omitted). Thus, it appears that counsel's decision not to pursue a voluntary manslaughter instruction was part of a trial strategy fashioned around total acquittal rather than arguing for a voluntary manslaughter instruction.

As previously discussed, an overview of the trial transcript would support this view. On this score, it is evident that trial counsel reviewed the statements of the witnesses, but simply framed his cross-examination to attempt to create doubt in the minds of the jury as to whether any of the witnesses could credibly testify to the

events that took place that evening. Trial counsel pointed out that most of the witnesses were intoxicated at the time, that it was dark in Forever Nights, and that the murder weapon was recovered from a different individual whose picture was never shown to the witnesses as a potential suspect. McDonald testified that he could not remember anything about that night. Thus, it was reasonable to pursue a theory of the case that would result in acquittal.

In sum, we are mindful that the Supreme Court has observed that a "doubly deferential judicial review . . . applies to a Strickland claim evaluated under the § 2254(d)(1) standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009); see also Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (noting that the review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas"). Given this deferential standard, we cannot conclude that the state courts' decisions relating to these ineffective assistance of counsel claims were an unreasonable application of Strickland or based on an unreasonable determination of the facts. To the contrary, the PCRA court's and Superior Court's analyses of these ineffective assistance of counsel claims are thorough and well-supported by both the law and the facts of the petitioner's case. Accordingly, these claims do not warrant McDonald habeas relief.

Finally, we have carefully considered whether McDonald is entitled to a certificate of appealability under 28 U.S.C. § 2253. As the Supreme Court

observed "the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484, (2000). Here, we conclude that McDonald has made no such showing, nor can he in light of the state court findings and clear evidence of his factual guilt. Simply put, we believe that no reasonable jurist could now find that the state courts misapplied the law in finding that McDonald committed this murder, considering the weight of eyewitness testimony in this case. Accordingly, a certificate of appealability will not issue in this case.

## IV. <u>Conclusion</u>

Accordingly, for the foregoing reasons, the petition for a writ of habeas corpus in this case will be DENIED, and that a certificate of appealability will not issue.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: March 6, 2024